J-S18025-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 176 MDA 2022 |

Appeal from the Decree Entered January 18, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  076-ADOPT-2021

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 177 MDA 2022 |

Appeal from the Decree Entered January 18, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  075-ADOPT-2021

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: AUGUST 12, 2022**

D.W. ("Father") appeals from the decrees terminating his parental rights

as to his minor children. Father's counsel has filed an **Anders**[1] brief and a

---

[1] **Anders v. California**, 386 U.S. 738 (1967); **see also In re V.E.**, 611 A.2d 1267, 1275 (Pa.Super. 1992) (holding **Anders** protections apply to appeals of involuntary termination of parental rights).

petition to withdraw as counsel. We grant counsel's petition to withdraw and affirm the termination decrees.[2]

The two children at issue here are R.W., born in 2013 ("R.W.2013"), and R.W., born in 2014 ("R.W.2014"). Their biological mother, A.M. ("Mother"), has three other children: R.M., born in 2017 ("R.M.2017"), R.M., born in 2018 ("R.M.2018), and R.Y., born in 2020. The father of these three other children is deceased.

All of the children, except for R.M.2018, have significant special needs, which require additional and specialized care. N.T., 12/3/21 A.M., at 52; N.T., 12/3/21 P.M., at 36. Specifically, R.W.2013, R.W.2014, and R.M.2017 have autism. N.T., 12/3/21 A.M., at 52. Several of the children are either non-verbal or limited with talking and are not toilet trained. *Id.* at 54; N.T., 12/3/21 P.M., at 33. R.Y. was born with Wolff-Parkinson-White syndrome, which is a heart condition that requires him to take daily medication. N.T., 12/3/21 A.M., at 52-53.

In July 2018, the Cumberland County Children and Youth Services ("CYS") received a General Protective Services referral alleging that there were parenting issues, mental health concerns, lack of medical care for the

---

[2] Father filed separate notices of appeal from each order, and we consolidated the appeals *sua sponte*. **See** Pa.R.A.P. 513. The trial court also terminated the parental rights of the children's Mother and her appeals are pending separately at Nos. 263 MDA 2022, 264 MDA 2022, 265 MDA 2022, 266 MDA 2022, 267 MDA 2022, 273 MDA 2022, 274 MDA 2022, 275 MDA 2022, 276 MDA 2022, and 277 MDA 2022.

children, inadequate food, and domestic violence in the home between Mother and Father. *Id.* at 50-51, 55. Mother was also unable to cope and overwhelmed with the children. *Id.* at 55. Mother and Father were living at the home with all five children at that time. Upon this referral, CYS learned that there was lead in the home and that R.W.2013 had been found to have very high levels of lead in him. *Id.* at 51. R.W.2014 and R.M.2017 also had levels of lead in them but not as high as R.W.2013. *Id.* CYS advised Mother and Father to vacate the home. *Id.* The Department of Health found lead in the home after conducting an environmental test and directed Mother and Father to have the children re-tested. *Id.* However, no appointments were made to have the children re-tested except for one child. *Id.*

When CYS learned that only one child had been re-tested for lead, it removed the children from Mother and Father's care by emergency order in December 2018. *Id.* at 51-52. R.W.2014, R.M.2017, and R.M.2018 were placed in foster care, while R.W.2013 was hospitalized for lead treatment. *Id.* at 52. Mother moved out of the home that contained the lead in December 2018. *Id.* at 56. Father continues to reside in that home. N.T., 12/3/21 P.M., at 21-22; N.T., 1/14/22, at 25.

The children were adjudicated dependent on January 10, 2019, and R.W.2013 was placed in a different foster home than his siblings after his hospitalization due to his special needs. N.T., 12/3/21 A.M., at 52. R.W.2013 was eventually placed in his maternal grandmother's house in March 2021. *Id.* at 54. R.Y. was born in 2020 and was placed with his three siblings at the

foster home when he was seven months old. N.T., 12/3/21 P.M., at 30. The four youngest siblings, R.W.2014, R.M.2017, R.M.2018, and R.Y., currently reside in the foster home, which is a pre-adoptive home. *Id.* at 28, 67. R.W.2013 continues to reside with his maternal grandmother, who is also a pre-adoptive resource. *Id.* at 28, 89. The children have sibling visits with each other. *Id.* at 31.

CYS ultimately filed petitions for involuntary termination of Mother and Father's parental rights in November 2021. Hearings on the petitions were held on December 3, 2021 and January 14, 2022. The court heard testimony from the CYS caseworkers, foster mother, maternal grandmother, maternal grandmother's roommate, Father's probation officer, the Court Approved Special Advocate ("CASA"), Mother, and Father.

As part of the reunification plan, Mother's goals were to maintain appropriate housing, visitation with the children, improve parenting skills, and mental health treatment. N.T., 12/3/21 P.M., at 8-9. Father's goals were to obtain housing, improve parenting skills, mental health treatment, drug and alcohol treatment, and visitation with R.W.2013 and R.W.2014. *Id.* at 16-23.

Mother made progress on her goals and by October 2019, R.M.2017 and R.M.2018 were returned to her care. *Id.* at 49. In December 2019, R.W.2013 was returned to Mother's care. *Id.* After Mother gave birth to R.Y. in March 2020, he was also placed in Mother's care. *Id.* at 49-50. At that time, Mother had four of the children in her care and had overnight visits with R.W.2014. *Id.* at 51. R.W.2014 remained in foster care.

In May 2020, Mother moved into a shelter with four of the children along with her paramour, the now-deceased father of the three youngest children. N.T., 12/3/21 A.M., at 57. In August 2020, they were asked to leave the shelter due to constant reports of the police having to come to the shelter for domestic arguments between Mother and the now-deceased father. *Id.* At that time, R.W.2013's behaviors became overwhelming for Mother, so she arranged for him to temporarily live with Father's cousin. *Id.* at 57-58. Mother's mental health began to decline, and she reported that she "was not a good mother" and that "things were closing in on her." *Id.* at 60; N.T., 12/3/21 P.M., at 52. Mother went to a crisis center and was recommended for an inpatient partial program, but she declined. N.T., 12/3/21 A.M., at 60-61; N.T., 12/3/21 P.M., at 54.

The family then moved into motels until September 2020, when Mother was able to obtain an apartment. N.T., 12/3/21 A.M., at 58. R.W.2013 returned to Mother's care and four of the children, along with the now-deceased father, lived at the apartment. *Id.*

On October 26, 2020, Mother was arrested for allegedly stabbing the biological father of the three youngest children, which resulted in his death. *Id.* at 65. R.M.2017, R.M.2018, and R.Y. were then immediately placed into the foster home where their sister, R.W.2014, was living. *Id.* at 49. R.W.2013 was eventually placed with his maternal grandmother. *Id.* at 54. R.W.2013, R.M.2017, R.M.2018, and R.Y. were behind on their medical appointments and

immunizations when they came into placement at that time. N.T., 12/3/21 P.M., at 14.

Since her arrest, Mother has been incarcerated awaiting trial. N.T., 12/3/21 A.M., at 65-66. She has not had any visits with the children since her incarceration because she did not want the children to see her behind the prison glass. However, she has had phone calls with the children and has sent them cards and letters. N.T., 12/3/21 P.M., at 15, 86. Mother testified that she would like all five children to be placed with her mother while she is incarcerated. N.T., 1/14/22, at 14-16.

Father struggled to meet his goals throughout the case. Although he completed a parenting assessment in November 2018, he declined to participate in the recommended parenting education services. N.T., 12/3/21 A.M., at 27. From the beginning of the case until January 2021, Father had no contact with CYS and made no progress on any of his goals and only occasionally visited his two biological children, R.W.2013 and R.W.2014, with Mother always present. N.T., 12/3/21 P.M., at 23-26. In January 2021, he reached out to CYS to schedule visits with R.W.2013 and R.W.2014. *Id.* at 26. CYS made a referral for guided visits but Father never followed up with the scheduled intake appointment. *Id.* at 26-27. Father was then incarcerated from February 2021 to August 2021. Father declined visits with R.W.2013 and R.W.2014 while incarcerated. *Id.* at 27.

In October 2021, Father began working on his reunification goals. He began having weekly guided visits with R.W.2013 and R.W.2014 at Alternative

Behavior Consultants ("ABC"). N.T., 12/3/21 A.M., at 41-42. However, R.W.2014's foster mother reported that R.W.2014 becomes defiant and rolls on the floor following visits with Father. N.T., 12/3/21 P.M., at 36-37. In October 2021, Father began intensive outpatient therapy to address his mental health and drug and alcohol treatment and was reported to be doing well in therapy. *Id.* at 20. Father has also consistently had negative drug screens since October 2021. *Id.* at 20, 43-44. However, Father's housing has not changed and he still resides in the home with high levels of lead. *Id.* at 21.

Father testified that he has been sober for 11 months and he attends drug and alcohol classes three days a week. N.T., 1/14/22, at 19. He admitted that when Mother was making progress on her goals, he "backed off" on his reunification goals. *Id.* at 23. He stated that he has been more engaged since his release from prison. *Id.* Father admitted that he still resides in the same home with the lead but stated that he is on waiting lists for other apartments. *Id*. at 25. Father testified that he is bonded to his children. *Id.* at 21.

Sandra Gibson, the CYS caseworker, testified that R.W.2014, R.M.2017, R.M.2018, and R.Y. are doing very well in the foster home. N.T., 12/3/21 P.M., at 28. Gibson stated that the foster parents are very good at meeting the children's specialized needs, responding to their behaviors, and showing them love and affection. *Id.* at 31. She indicated that the children feel safe and secure in the home. *Id.* at 29. Gibson noted that R.W.2014 has been with the foster parents for close to three years and R.Y. has been there for over half of

his life. *Id.* at 28, 30. She testified that all four children are very bonded to the foster parents and call the foster mother "mama." *Id.* at 28-29, 30-31.

Foster mother testified that R.W.2014, R.M.2017, R.M.2018, and R.Y. are thriving in her care because it is a structured environment. *Id.* at 66, 71. She stated that she and her husband love the children and would like to adopt them. *Id.* at 67.

Maternal grandmother testified that she is bonded with R.W.2014 and is willing to adopt him. *Id.* at 89, 90.

Father's visitation supervisor at ABC, Kevin Beam, testified that guided visits between Father and R.W.2013 and R.W.2014 began in October 2021. N.T., 12/3/21 A.M., at 41. Beam stated that visits were chaotic in the beginning but are "getting progressively better." *Id.* at 43. He observed a bond between Father and R.W.2013 and R.W.2014. *Id.* at 45.

The CASA worker, identified in the transcript only as Mr. Howell, agreed with Gibson that the foster parents love R.W.2014, R.M.2017, R.M.2018, and R.Y. and have provided them with the most stability they have ever experienced in their short lives. N.T., 1/14/22, at 39. Mr. Howell stated the children have "flourished academically, socially, emotionally, and physically while in the care of" the foster parents. *Id.* He further stated that maternal grandmother loves R.W.2013 and she has provided him with stability and support while he has been in her care. *Id.* at 39-40.

The children's Guardian *ad litem* ("GAL") stated the children are very loved and stable in their respective pre-adoptive homes and recommended

that it was in the children's best interests for Mother and Father's parental rights to be terminated. *Id.* at 44.

The court attempted to speak with two of the children but determined that they were not competent to testify. *Id.* at 43. Children's legal counsel concurred that Children did not understand the nature of the proceedings and therefore, deferred to the recommendations of the GAL and CASA. *Id.* at 44-45.

Following the termination hearing, the court changed the permanency goal to adoption for the children. The court also involuntarily terminated Mother's parental rights as to all five children and involuntarily terminated Father's parental rights as to his two biological children, R.W.2013 and R.W.2014. This appeal followed.

Father's counsel's *Anders* brief identifies three issues:

1. Whether the [t]rial [c]ourt abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of [Father's] parental rights to his children under Section 2511(a) of the Adoption Act, 23 Pa.C.S.A. §2511(a).

2. Whether the [t]rial [c]ourt abused its discretion and committed an error of law in terminating [Father's] parental rights when the conditions which led to the removal or placement of the children no longer existed or were substantially eliminated, thus contravening [S]ections 2511(a) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a), (b).

3. Whether the [t]rial [c]ourt abused its discretion and committed an error of law in determining it would be in the children's best interest to have parental rights terminated, when [Father] loves his children, the children

are bonded with him, and he is ready, willing, and able to parent the children and provide for their needs, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A § 2511(b).

***Anders*** Br. at 4-5.

Before reviewing the merits of this appeal, we must first determine whether counsel has satisfied the necessary requirements for withdrawing as counsel. ***See Commonwealth v. Goodwin***, 928 A.2d 287, 290 (Pa.Super. 2007) (*en banc*) ("When faced with a purported ***Anders*** brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw"). To withdraw pursuant to ***Anders***, counsel must: 1) "petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous;" 2) furnish a copy of the brief to the client; and 3) advise the client that he or she has the right to retain other counsel or proceed *pro se*. ***Commonwealth v. Cartrette***, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*).

Additionally, in the ***Anders*** brief, counsel seeking to withdraw must:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009). If counsel meets all of the above obligations, "it then becomes the responsibility of the reviewing court to make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." *Id.* at 355 n.5 (quoting *Commonwealth v. McClendon*, 434 A.2d 1185, 1187 (Pa. 1981)).

We issued an order stating that although counsel filed an *Anders* brief, he failed to file a petition to withdraw as counsel and had not attached a copy of a letter advising Father of his right to proceed *pro se* or proceed with a private attorney. We directed counsel to file a proper petition to withdraw within seven days of the date of the order. Order, 4/12/22. Counsel complied.

Counsel has now met all of the above technical requirements. In his *Anders* brief, counsel has provided a summary of the factual history of the case with citations to the record. Further, counsel's brief identifies three issues that could arguably support the appeal, as well as counsel's assessment of why the appeal is frivolous, with citations to the record. Additionally, counsel served Father with a copy of the *Anders* brief and advised him of his right to proceed *pro se* or to retain a private attorney to raise any additional points he deemed worthy of this Court's review. *See* Application to Withdraw, 4/18/22, at ¶ 8. Father has not responded to counsel's petition to withdraw. As counsel has met the technical requirements of *Anders* and *Santiago*, we will proceed to the issues counsel has identified.

Father's first two issues challenge the sufficiency of the evidence supporting termination of his parental rights under 23 Pa.C.S.A. § 2511(a). Father argues that he actively began working on his goals upon his release from prison in August 2021. Father's Br. at 13. He maintains that he was consistently engaging in visitation, completed a new parenting assessment, and was addressing drug and alcohol concerns by receiving intensive outpatient therapy. *Id.* at 13-14. Father contends that the court failed to consider that being incarcerated for seven months severely limited his ability to work on his goals. *Id.* at 14. According to Father, if he had been given additional time, he could have completed all of his goals. *Id.*

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018) (citation omitted). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *In re*

*Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (quoting *In re Z.S.W.*, 946 A.2d 726, 728-29 (Pa.Super. 2008)).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Instantly, the court terminated Father's parental rights pursuant to Section 2511(a)(8). *See* Trial Court Opinion, filed 3/10/22, at 14. That section states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Section 2511(a)(8) "sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been proven, the court "must next determine whether the conditions that led to the children's removal continue to exist." *Id.* "As a result, the relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010).

Here, Father does not dispute that R.W.2013 and R.W.2014 had been removed from his care in excess of 12 months. *See* Father's Br. at 13. Therefore, we next focus our inquiry on whether the conditions which led to

the children's removal from Father's care continued to exist at the time the court terminated Father's parental rights.

The court found that the conditions that existed at the time of the children's placement continued to exist at the time of the termination hearing. Trial Ct. Op. at 15-16. The court noted that R.W.2013 and R.W.2014 had never been returned to Father's care since the inception of the case. *Id.* at 14. The court found that Father made no progress on any reunification goal until late 2021, just prior to the filing of the termination petitions. *Id.* at 14-15. The court emphasized that Father was still living in the lead-infested house and had not obtained new housing, despite having three years to do so. *Id.* It also observed that Father had only recently began having regular visits with R.W.2013 and R.W.2014 and attending drug and alcohol treatment. *Id.* at 15, 16. The court concluded that Father's "eleventh-hour start to show any remote progress on his goals does not serve to alter our finding that the conditions leading to the removal of the children have not been remedied." *Id.* at 15.

The record supports the court's finding that the conditions which led to R.W.2013 and R.W.2014's removal continue to exist. The children were removed due to high levels of lead in the house and Father continues to live in the same unsuitable residence. Father has had sporadic and limited contact with the children for the majority of the case and had only recently begun to make any progress on his goals. Although Father claims that his seventh-month incarceration precluded him from completing his goals in time, he offers no explanation as to why he made zero progress on his goals in the over two

years before his incarceration. Father has had over three years to complete his goals and R.W.2013 and R.W.2014 cannot linger in care waiting for Father to be in a position to meet their needs. This Court has explained:

> We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. . . . However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

Because Father failed to remedy the situation that led to R.W.2013 and R.W.2014's removal from his care, and, as discussed below, termination of parental rights would best serve the needs and welfare of the children, we find no reasonable basis on which to argue that that the requirements of Section 2511(a)(8) were not satisfied.

The next issue raised in counsel's **Anders** brief alleges that the court abused its discretion in finding termination best served the needs and welfare of R.W.2013 and R.W.2014 pursuant to 23 Pa.C.S.A. § 2511(b). Father argues that the court failed to properly consider the evidence that he loves his children and that they are bonded to him. Father's Br. at 10.

Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to

determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). This inquiry involves assessment of "[i]ntangibles such as love, comfort, security, and stability[.]" ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa.Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." ***Id.*** However, the "mere existence of an emotional bond does not preclude the termination of parental rights." ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court must consider whether severing the bond "would destroy an existing, necessary and beneficial relationship." ***Id.*** (citation and internal quotation marks omitted). The court must also examine any pre-adoptive home and any bond between the child and the foster parents. ***In re T.S.M.***, 71 A.3d 251, 268 (Pa. 2013).

Instantly, the court found that termination of Father's parental rights was in the best interests of R.W.2013 and R.W.2014. Trial Ct. Op. at 17-18. The record supports the court's finding. There was ample evidence that R.W.2013 is bonded with his maternal grandmother and R.W.2014 is bonded with the foster parents. The children feel loved and secure in their respective foster homes. Although there was evidence that the children have a bond with Father, the court recognized that R.W.2013 and R.W.2014 deserve permanency and stability. We perceive no reasonable basis on which to challenge the conclusion that termination of Father's parental rights would be in the children's best interests.

To summarize, we find that the issues raised in counsel's **Anders** brief are wholly frivolous. Further, after an independent review of the record, we conclude that no other, non-frivolous issue exists. Therefore, we grant counsel's petition to withdraw. Having determined that the appeal is wholly frivolous, we affirm the decrees terminating Father's parental rights.

Petition to withdraw as counsel granted. Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/12/2022